and Mr. Loper, whenever you're ready, we'll hear from you. Please the court, I'm Johnny Loper from Raleigh, North Carolina. I'm here with my co-counsel, Mr. Chris Morris from Minneapolis, Minnesota. We represent Voyager in this matter, U.S. Bancorp and Voyager Fleet Systems, which I'll refer to just as Voyager. And I'd like to make it clear that when I refer to Mygallons going forward, I'm referring to Mygallons LLC, the plaintiff in the case and the only defamation plaintiff in the case. I think the issue before the court today broadly stated is this. Whether desk statements that were issued by Voyager in response to a press release that was issued by Mygallons, and press release falsely informed consumers that if they paid money to Mygallons, they could access Mygallons' supposed consumer gas price club by using the Voyager data collection and payment network. So the question is whether, as a matter of law, that the desk statements that were issued by Voyager can support a $4 million defamation claim. Now, at the court's pleasure, I plan to touch on three issues. The first one being liability and whether those desk statements can support a claim for defamation under the circumstances. Causation, why the desk statements don't establish causation for special damages in the verdict. And third, and probably very briefly, why the expert testimony the plaintiffs offered should have been excluded. I don't know why you would make that your very brief argument. Because, Your Honor, my thought was it would probably be of less interest to the court from a legal standpoint. It is of most interest to me, and I'll be happy to speak to that in more detail if Your Honor would like. You organize your argument any way you like. Yes, ma'am. It's got a jury verdict here. Yes, ma'am. I think consideration of the desk statements and whether liability can attach to them requires some consideration of the context in which those desk statements were issued. Now, here's what we know. On June 30 of 2008, my gallons went nationwide. It sprang from nothing to nationwide publicity with this press release that it issued, touting this consumer nationwide gas club that supposedly utilized the Voyager payment processing system. Now, Voyager felt that that press release needed to be countered immediately. Why? Well, first, because there was no functioning my gallons nationwide consumer gas club at that time. Consumers could not pump gas that they might have purchased from Voyager, from my gallons, because my gallons had no contract with Voyager. Were you established in front of the jury there was no contract? Yes, ma'am. There's a jury verdict. Okay, you won there. Yes, ma'am. I don't know that that's so determinative. The jury found instead that there was defamation here. Yes, ma'am. Which it was entitled to do. That's the jury finding. Yes, ma'am. Okay. So Voyager's thought was that telling Mr. Verona and my gallons to simply cease and desist was not enough, that what they needed to do to prevent harm in the marketplace and to Voyager itself was to counter the false information on a going forward basis. Voyager was concerned about that consumers should know that if you give your money to my gallons, you're not going to be able to get a card that says Voyager own it, you're not going to be able to pump gas, and you're not going to be able to recognize the benefits. See, I think this is all a good argument. Yes, ma'am. And I'm not sure I wouldn't have agreed with you if I'd been on the jury. But they had some other evidence. They had evidence that maybe you had given a corporation with which you were associated the ability to contract and to work for their, quote, predecessor. They put that in front of the jury. There was indisputably such evidence. They put forward the evidence that maybe you backed out of this because you got pressure from somebody else, some other client of yours that was doing the same thing. So although I'm not sure I would find all that persuasive, and they found evidence that maybe your statements weren't totally, they had to be parsed by a careful use of the word what does is mean. In other words, we do not now have an association. There is no association. Whereas at one time there was an association. So it seems to me that just recounting your facts in light of a jury verdict is not very, how long did this trial last? Over a week, Your Honor. Yeah. So you're not going to get, unless you start to recount their good facts too, you're not going to give us a real sense of what was in front of the jury in 20 minutes. That's true. Your Honor, our position on that is that what came before the desk statements is of no moment. What you need to tell people as of July 1, 2008, is what the future holds for them if they send money to my gallons. So our point is, even under the standard that the court has to review this in, that there is no substantial evidence that supports a defamation verdict. One second. I'm sorry. So you're essentially relying on the fact that the desk statements, with the exception of the third one, are couched in the present tense. The is. I mean, that's essentially your case, isn't it? Yes. Well, I think you can look at the desk statements, and you look at each individual statement, and you can also look at the desk statement as a whole. The first statement in the desk statement, for example, is, Voyager does not have a contract with my gallons. We know that's true. So that's indisputably true. There are no ongoing negotiations to enter into any agreement. The undisputed proof in the record, I would assert to you, is that that's true as of no later than 1229 p.m. on July 1. There is no evidence in the record, and certainly no substantial evidence, that there were any ongoing negotiations after that point. Mr. Tofte's e-mail to Mr. Verona and his attorney says there is not a contract between my gallons LLC and Voyager, and there will not be one, and we're not going to negotiate with you further. So that statement, I think, is undeniably true based on the record. There's nothing that contradicts that particular statement. The next statement is we are not affiliated with my gallons. Well, we could sit here and argue, Judge Motz, over what the word affiliation might mean. No, we're talking about our. Once again, you're relying on the present tense. Yes, ma'am. Well, Minnesota law, which is controlling, so we're dealing with Minnesota law, is well settled that false statements non-defamatory on their face but capable of an implied defamatory meaning are actionable. Yes, ma'am. And that's their case, I guess. Well, their case, if you look at their brief, when they look at this point, they speak totally in the past tense. They don't dispute what I've just told you. They don't dispute, obviously, that there's no contract. There can't be any agreement outside a contract on which they could have relied to require us to provide these services. That's the promissory estoppel. Do you remember the famous television confession, depends on what is means? Yes, ma'am. Well, that's what this evidence reminds me of. And I never really understood. I didn't understand it because you're as clueless as I am. But now I understand it in this case. Well, I understand what Your Honor is thinking. Our point is that if you view this in terms of the circumstances at the time, what Voyager is trying to do is to tell the people who are affected by this press release, whatever you may think happened in the past, whatever my gallons may have told you, from this point forward, we're telling you. But, of course, it didn't say that. It didn't say, notwithstanding our relationship with them in the past, from this moment forward, we're not doing this. Well, it doesn't speak to that issue. And if Your Honor thinks that that is a substantial enough omission, then we probably lose on that issue. Just what I'm trying to do is to see if there's a basis for the jury verdict. Yes, ma'am. That's where you are, with losing in front of the jury, not with making a jury verdict argument to us. Yes, ma'am. All I'm trying to say is even under the standard under which you have to review here, if you look at the death statement either as a whole or you look at each individual statement, each individual statement is objectively true in the record. There's no substantial evidence to support that any of those four statements that make up the substance of the death statement is false. Well, the Minnesota law refers to substantial truth. Yes, ma'am. Isn't that the term? What does the Minnesota case law, how does it define the term substantial truth or does it attempt to? It says, for example, that minor discrepancies are immaterial. So, for example, in the first death statement, I think you understand that the company finds out in the morning of July 1 that it's supposed to have a contract with a company called MyGallons. It searches its database. It finds nothing. And the press release says we do not have a contract to do business with MyGallons.com. Now, the company's name is not MyGallons.com. It's MyGallons, LLC. MyGallons.com was the DBA of Zeneca, a separate company. Mr. Loper, before your time's up, I suggest you address damages because I, like Judge Motz, am somewhat concerned about the damages and about the testimony. Well, causation and damages, Your Honor, MyGallons acknowledges that the judgment contains special damages and general damages. The trial court acknowledged that. And MyGallons asserts that the special damages allegedly poisoned the well with these replacement processors. So, in order to recover special damages, what they have to do is- Let me just stay with general for a second. What is the measure of damages for general? Well, it's the value. In this case, it would be the damage to the reputation of MyGallons, not to Mr. Barone. How do you measure that? Well, the jury has to put a number on it, Your Honor. Well, they had an expert testify what? It was $248 million. $208 million, Your Honor. Close. Okay, $208. They had two experts, and that's the point I was going to reach later and perhaps with three minutes in my summary. Where did they get the $208 million? They hired two experts, Your Honor. I know that. I just want to know where they got that number. Where the experts got that number. Okay. The first expert, Dr. McCoo, who was hired to provide a sales figure, the number of memberships that MyGallons would have sold if it had gone forward. Dr. McCoo, who has no history in sales, never taught a sales course, never performed a sales projection. Get that. I want to know where she got the number. She compared MyGallons to companies like Costco, eHarmony, Amazon, the great Internet successes of our time, and she said MyGallons could have done the same thing. What did she base that on? Well, her report, Your Honor, I don't know other than to say that she literally equated what Amazon, Costco, and eHarmony had done over their careers. Rather than comparing or taking into account e-businesses that had failed, she simply said they will sell 3,300,000, I believe, memberships in three years. The accountant, Mr. Seitz, took 3 million. What if the price, did she take into account, was there any question put to her, if the price of gas went down, what would happen? She said that that didn't figure into her calculations. Your Honor, I ask that question because, as Your Honor has probably noted, when MyGallons was introduced, it was introduced at the absolute apex of gas prices. I think gas went up to $4.11 or $4.17 a gallon, and literally the week after MyGallons was introduced, the price of gas fell, I think, for at least six months, if not a year. I asked her that question, and she said, I didn't consider what actually happened. I just considered what the business plan told me. So she did not take that into account, and that's one of her failings that goes to credibility, not to admissibility. Why does that go to admissibility? It becomes total speculation. We don't admit evidence, it just speculates. And that's our point, Your Honor. If you are proposing an expert, my one-liner on that is, I would say that Daubert requires that if you're going to be qualified as an expert, you probably need to confess or assert that you are. If you check her testimony, when I did the voir dire on her, she said, I don't claim to be an expert in sales. I've never taught a course in sales. I've never had a job in sales. Well, that just might be modesty. I mean, no man would say that, of course, but a woman might say that. But I think that you're looking at her testimony. I'm not even sure this 66 percent, this whole thing about this study that she looked at and that she actually misread or something. Yes, ma'am. But you cross-examined her in front of the jury, right? Yes, ma'am, I did. And all that stuff came out. It was her. Yes, ma'am. My point is it should never have gotten there because, as Judge Niemeyer says, and the cases that we pointed out say when you get to that point, you're in fairytale land. That's what that testimony was. I'm trying to figure out why it all shouldn't be thrown out, and I'll ask your colleagues on the other side this question, too. But if you build a house of cards just on speculation, somebody says, I have a business plan, this is the way I hope to do it, and I'm going to have sales of $200 million, I mean, courts of law, that's not the subject matter of a trial. And, well, your time's up, and we'll get you on the phone. Thank you, sir. Mr. Jackson. May it please the Court, I will first address Mr. Loper's issues about the desk statements because I think that if we take a look at the sequence of the desk statements, if we look at the first, very first one, the statement is we don't have a contract, and although we disagreed with that at trial, the jury found that, and the defendants may think the jury was rational on that determination but not on the rest, but we, for the purposes of this argument, accept that. We did not authorize the use of our name in association with this venture, which is contradicted by the evidence in the record, that both U.S. Bank and Voyager were intimately involved with the design and approval of cards which had the Voyager logo and a statement that the Voyager network was going to be used. A little background on this, and this is all in the record. The jury heard conflicting testimony, but in the record, there is from Go Gas testimony that they anticipated that initially Go Gas would be the party with whom my gallons would contract to get access to the Voyager network, and that as this program grew and got larger, that it would be transitioned to Voyager, and in fact, Voyager was working on an addendum to a contract direct with my gallons. So the first desk statement is not even technically accurate because there was evidence in the record whereby the defendants authorized use of their name. Now, the statement that we are not affiliated, again, conveys a misimpression because the record is rife with e-mails and communications between Go Gallons, my gallons and Go Gas on the one hand, U.S. Bank and Voyager on the other, and I would submit that U.S. Bank and Voyager can't simply say when they want to deny the existence or terminate a relationship, we're not affiliated. We wash our hands of this because the test for the desk statements are were they substantially and contextually misleading? Did they leave out facts so that the statement conveys a defamatory meaning? And I think as we walk through the next three statements, it's evident that they have recognized that the first statement is not accurate. So they change it to say we have no ongoing negotiations. And at the end, the fourth statement, they acknowledge we did have a commercial fleet fuel card contract. So each step of the way, every day that passes in their desk statement changes, they are very conscious of the fact that, I would submit, it conveyed a misimpression. And that misimpression was defamatory in the sense that these parties have been working together for weeks and weeks. And what happened was the morning of July 1st, an executive from Pricelock saw the television and other media exposure of this program, immediately emailed U.S. Bank and said, you've got to stop this. That was July 1st, you're saying, but the Tosse email came what, June 30th? The email that I'm referring to I thought was July 1st, it could be June 30th, but it was the time, it was contemporaneous with the publicity. And the reference that the defendants make to, well, these were lower level employees. Well, first of all, the Voyager employees they were working with and the U.S. Bank employees that they were working with on the cards and access to the systems were not lower level employees, but if they were, that should not make a difference. What happened is they had a Pricelock and somebody very high up in U.S. Bank communicated, perhaps it was news to the recipient from U.S. Bank, but the fact was Pricelock said, you've got to stop this, it's going to be bad for you, it's going to be bad for Pricelock, it's going to be bad for Chrysler. So what the Bank and Voyager did at that point is wash their hands of Mike Allen's. And that, in essence, caused other potential providers to be extremely suspicious, because now Los Angeles Times, the UPI, AP, and the Better Business Bureau were calling the Bank and asking what's the story here? And the Bank wouldn't respond except with its desk statements. What happened was, you can go to Google today and put in Mike Allen's, it's the same sort of information. Yes, it is. Let me assume right now that these statements destroyed Mike Allen's completely as a company. That would be the maximum value that you could have as the value of the company. Damages can't be greater than the value of the company unless they're punitive. And we have this testimony that projects this company that has never generated a profit, that has no capital, it's not an ongoing venture, suggesting that this company is going to make $208 million in sales. It's constructed out of zero. It's just total speculation, picking companies out of the economy without a relationship to the thousands and thousands of ventures that fail every day. I mean, that's the type of evidence I've never seen to justify, and I say never, as a lawyer or as a judge, to justify damages. We have a $4 million verdict here, and you tell me if you could find anybody in this whole country who would pay $4 million for my gas. Quite apart from looking at the business plan, which was basically assuming a perpetual increase in gas, and the idea that the common knowledge that gas goes up and down, your expert didn't even account for the downside on that, there's something fundamentally problematical with what occurred in this. You may be entitled to some damages, but I'm troubled by this, and I'd like to hear comforting words from you that make your verdict sound plausible and supportable. Your Honor, first of all, in terms of the business model and whether it would have worked, the jury heard evidence from their hedging expert and our hedging expert, and I think, given the verdict, the jury determined, appropriately so, with sufficient evidence, that the program would have worked. The evidence is just logic. There is no evidence. There's no evidence. This is a plan like two people sitting over a beer, and the jury's assessing, is that a good plan? That isn't what damages are about, real-life damages. Your Honor, I want to distinguish between the jury's determination that the plan have worked and the jury's damages, because I think there is an important distinction. Obviously, the jury did not accept Dr. Miku's projection of $3.3 million. I don't know whether their determination was a mix of special and general. Well, I'm even more fundamental. To damage something, you have to have something of value to damage. And my question, is there any evidence that my gallons had any value? Absolutely. Other than a negative value. Absolutely, Your Honor. What's the evidence? And I would suggest that you would have had somebody, but for these death statements, pay $4 million or more for this company, and this is the reason. I'm not logic. I want to know actual facts. Do we have a profit and loss statement? Do we have an ongoing balance sheet? Do we have projections, financial projections, that show actual growth of sales? We didn't even have the plan off the ground yet. The positive publicity was virtually unprecedented. The response, within a matter of days, there were 6,000 people who paid money. Within a few days after that, 27,000 who tried to pay money. Okay, 6,000 who paid money. Do we know how much they paid? $24. So we have 6 times 24. I want to address this because I think it goes to the core of the case. We don't know what the jury was thinking. We often don't. It doesn't matter. But this is what they could have done. When we consider things as a matter of law, we don't go and speculate what the jury did. We look at whether the jury had evidence from which to reach its conclusions. They did, Your Honor. And my question is, in this case, I have looked at this, and I can't figure out, other than sheer speculation, somebody standing up and saying, I believe it's going to be like Netflix, or I believe it's going to be like Amazon. That's not evidence. If they thought that it was going to be like Amazon or Netflix, they wouldn't have awarded $4 million. No, I'm talking about the expert testimony. That's speculation. That is not hard evidence. So your response to Judge Niemeyer is they would have awarded $200 million that they thought it was going to be like Netflix. And the fact that they only awarded $4 million means that they didn't think that, so they weren't a bit fooled. Is that what your argument is? I think it's conceivable. If you want to look at the numbers and crunch the numbers, take $6,000 plus $27,000. That's $33,000. Multiply that by 24. Multiply that by the period of time from when it was launched until the trial. And that gets you to about $3 million. Right now, you have to subtract the hedging contracts, and you have to subtract the possibilities that gas is going to go down for six months. And, in fact, did go down if you're going to the time of trial. Yeah. But the payments are... I mean, this haul, this business didn't affect the scarcity of gas or the price of gas or anything. And then you have to figure out the profits. You had overhead, administrative. I didn't see all that laid out. You don't just go out and... And the ability to do it. This is a startup corporation. It is a startup corporation. And the very magnitude of the consumer interest to me indicates I haven't seen anything like that, where you have 33,000 people willing, and some did, pay to participate in this. On the issue of whether the hedging is included in this, I think that the jury heard that as a separate issue. That's a separate matter, just as an aside. It may turn out that you would have been shut down as improper hedging arrangements. The disclosures were not accurate. The public were taking bets. They were spending $4 for a price of gas on the assumption the gas would go up to $4.60 when they may lose their money and they weren't told that. All these issues were put forth in the course of this... I understand, but we don't have any numbers, any real numbers. The number we have is people just making them up. 33,000 people is not a made-up number. $24 per year is not a made-up number. And the jury may simply have said... But 33,000 people didn't pay the $24 per year. They couldn't. 6,000 did. To be sure, but we don't know that they would have because in the later years or later days, the price of gas went down, there were all these concerns about the legality of what you were doing. So I think it's a fault. I mean, I'm not sure that you don't have some damages. It's just I have a hard time looking at your expert's testimony as justifying these damages. Well, I will also submit that Judge Britt heard objections to this testimony five different times. He was in the courtroom when the testimony was given. There was rigorous cross-examination by defense counsel about these points that you were raising. And Judge Britt, the jury decided what it did. Judge Britt said that this expert passed the Daubert standard, and I think under General Electric v. Joyner, the standard to review that part is abusive discretion. Well, it's abusive discretion whether you let this type of evidence in at all. But how did Dr. Macu get to $208 million? She looked at the launch and the response those first few days. She looked at Google Analytics, and she projected out. So it's just a mathematical projection. There's no basis. There's no factual basis. I mean, it's a little bit like in a classroom. You're sitting there figuring out how much could you make if everything went perfectly, and that's not even so because you don't know. There's hundreds of things you don't know. But to just draw $208 million out for this little outfit called My Gas and say this is the basis on which we're going to conclude damages, pretty tough, isn't it? The jury didn't buy her number. Well, the jury bought your defamation and concluded there's something wrong here. There was an overreaction and that your client was hurt. It was stopped in its tracks. That's what the jury said, and they wanted awards. And, of course, all they heard were these huge numbers. And so they may have thought, well, $4 million is a modest compared to $200 million. We'll give them $4 million. That's the type of, if you want to speculate, what a jury might have done. That's not our role, and we can't do that, obviously. But I'm just playing your game along. In other words, what the jury might have done, I'm more interested in knowing what was presented to the jury from which it could draw that conclusion. I think that the response that people were interested in this, that it was getting media attention, that there were all these people who bought and people who tried to buy with sufficient evidence for the jury to say, one, we know at least that they lost this amount. Two, we think this idea could have worked. There is a reputational damage here. So either there's some mix of general and special damages, or I would submit that with respect to a corporation, I would suggest, I don't know if there's a case that said this, but it seems to me that if a corporation is claiming reputational damage, the most the corporation could ever claim is its fair market value. It could not claim more than it's worth at being damaged in reputation. I think the Hapco case covers this and addresses it. And in this case, it stated many other scenarios could explain the jury's verdict. For example, it's possible the jury properly used the lost market share as background, considered the value and nature of the business, the impact of the defamatory statements, and used its common sense. Now here, they were on the top of the mountain, and then they got an F from the Better Business Bureau. And they were completely destroyed in the media because of the defendant's statements, reactions, and non-response. Let me ask you this. What if I destroyed a lemonade stand that had been selling for a week and had sold $5 of lemonade every day? I destroyed its reputation, and they had to close down. Can I say that that lemonade stand would have become a Minute Maid, would have been purchased by Coca-Cola, would have been worth millions of dollars? I suppose that if that lemonade stand had 33,000 visitors in the first few days. I understand. Well, the lemonade stand is on a very busy street. Of course not. Three thousand cars go by every day. Of course not, and I submit that is a completely different situation.  My hypothetical is intended to point out the notion that when we're talking, we're not talking about personal reputation. We're talking about a corporate reputation. Theoretically, they can form new corporations. They're artificial entities, and their worth is determinable. And a lemonade stand's worth is determinable. You can totally destroy the lemonade stand, and there is a value for that business. There is a value probably for my gas. But my gas never got off the road, really. It was a startup. So to say a startup has value, if you look in the area of, for instance, antitrust law, where damages are always explored fairly thoroughly, I suggest that you might be surprised about how little a startup company can be treated in the face of the law. The reason this was a startup company and was not more than a startup company is because of the actions of the bank and the defense. Let me ask you a question regarding remedy. Let's say we disagree with you and say that the evidence of special damage is entirely speculative. What do you get? If the special damages are entirely speculative. Where are you left? I think that I say that the case law supports a verdict, and we don't know that this wasn't the verdict, of $4 million for general damages. Oh, you're saying? And how is that the case? Because there's reputational damages to this company that was off and running, and now the durational impact, the breadth and scope geographically and media-wise has destroyed its ability to continue as it would have. So if we reject that argument, then what happens? Pardon me? If we reject that argument, then what happens? If you come to the conclusion that there are no special damages, that the jury was wrong, and that there are no reputational damages, that the jury was wrong, that there was no sufficient evidence that you put forward, not that there were none, but that you didn't put forward sufficient evidence to justify $4 million in damages, then what happens? Under that situation, there would either be a remediator or a new trial. Why would you get a second crack? This is a sufficiency of the evidence analysis, is it not, in terms of damages? Why do you get a second crack to make your case? Let me say this. The defendants had an opportunity to ask for identification of what's special damages and what's general damages. They didn't. They should not be rewarded now because of their failure to do that. We could have been here talking about they gave X amount here, X amount there, and we would be in a much different place, I think. But you could have done that, too, to protect yourself, couldn't you? We didn't feel like we needed to do that. Well, but that may have been a miscalculation. And what we're trying to do is to figure out you have a jury verdict on liability and assume for purposes of my question that we don't find that that was error, then what are we to do? And we do find that there's not sufficient evidence in this record to support a $4 million damage award. And there's been no delineation by the jury about what these damages are. I mean, you've been living with this case. It was just taken up today, so you must have an answer to that question, right? They have been arguing from the get-go about special damages and special damages not being available. And, therefore, I say it was incumbent upon them, not us, to ask that question. But if there is insufficient evidence for special damages, then, as Judge Britt says, there should be, and we don't know there wasn't, an award upheld on general damages. And I do understand that is your first position. But what I'm telling you is that we don't find that any of the evidence you put in gave you a right to, however you calculate this, to $4 million in damages. So what are we to do? I know that some courts, appellate courts, have said a remittiture in this amount is appropriate, and you take it or leave it. And, otherwise, I would say that a new trial would be in order. Why do you get a second chance to make your case? You only do if we find it was possible that a jury could award you some damages. Is that it? Correct. If we find that there were no damages here. But why do you get it if we find it was possible that the jury could award you some damages but that you didn't put in the evidence from which we can track the evidence to the damages? Well, general damages, by their very nature, are intangible and somewhat speculative. And I think the jury hearing the cumulative evidence about what the reputation of this company was after these acts, I think there clearly was evidence, sufficient evidence, of reputational damage to warrant general damages. All right. Thank you. We'll come down and greet the counsel and take a short recess. Oh, you have some rebuttal? I'm sorry, Mr. Loper, you do. You have five minutes. I was going to cut you off. Maybe you can address the last question. I plan to, Your Honor. I was going to say I'd now like to amend my opening statement where I said I'm not so interested in damages. Maybe I'm a little more interested in damages now than when I started. I think Your Honors have hit on an issue here. Judge Niemeyer, you said how do you calculate the worth of this business? You're right. There's no financial statement. There's no balance sheet, no income statement. And that's because this business had been in business one day. They went live with a press release on June 30, 2008. Everything from which they say damages. Did they receive any gross monies? Judge, I don't know how much money actually came in. I know that people called up and said they wanted to purchase. No, no, no. He gave us a figure when they were up there. They had some money. Six thousand people, something like that. But the issue is how do you award damages? Did they have any kind of financial statement? No, sir. They'd only been in business for one day. The point is they've got. I understand. But every business may have a starting business with capital. And so do they have any capital? They had pro formas. They didn't have time to have an actual balance sheet. Do they have any capital? No, sir. They had no working capital. Do they have a line of credit? They had not set up a bank account. The required line of credit to cover the float between the time cards would be swiped and payment would actually come back to Voyager. No, sir. Well, they thought they had an arrangement with the group with which you were associated, whatever you want to call it, that allowed for that. And, indeed, the group with which they were associated did have an arrangement with the group with which you were associated. You say it's a whole different idea. I understand. I'm not sure I follow you, Your Honor. I'm sorry. If you're talking about the Zenecon? Yes. Okay. Zenecon, separate corporation. I understand that. But the jury is. But that corporation, that contract could never have supported this network because it was a fleet. No, I understand your arguments. But what I'm saying to you is that they had a basis for which they were able to argue to the jury that they were going to get some financing or they had some arrangement with this group with which you were associated. Did they have a physical establishment? I don't believe they had. If they had office space, I'm not aware of it. I thought it was run out of Mr. Barona's house. I can't state that as fact, though. No evidence in the record, one way or the other. I believe the expert testified that going forward they could get office space, but I don't believe they had office space in that regard. Do you know if they owned any property of any kind that had valuation? I do not believe they did, Your Honor. No, there's no evidence about this. There's no evidence of that. And so what you've got is a corporation that if you're looking for what the damage to their reputation was, aside from the special damages we've already talked about, if you're looking at what the damage to their reputation is, I think you have to consider it's a company that's one day old, it has no assets, it may have one employee if you count Mr. Barona. It has no working capital. It's using a lawyer who's owned loan from Office Depot. It's got a business plan that's at odds with what's actually happening in the economy, which the expert doesn't take into account when she gives you 3,300,000 people who will buy this, and then the accountant, Mr. Seitz, takes that number and pounds it into $208 million in total damages that they claim. So you don't have any value to this business. If you're looking at what the reputational damage is, what's the reputation? Well, I ask this question to your colleague, and that is in a commercial context, setting aside damages in individual reputation, a person's reputation, a business that has damaged reputation, can a business be damaged any more than its market value or its net worth market value? Your Honor, I would tend to agree with you. A startup business with no proven business, a business with no track record, I don't think you could look at cash flow in that circumstance. I think you'd have to be limited to whatever the net worth of the business is at that particular point because cash flow, future profit damages are too speculative to count in a situation like that. My question goes to reputational damage to a business. Yes, sir. Can it be any greater than the value of the business? And I guess the implicit answer is if this is an ongoing business, it can be. Is that what you're saying to us? I think you've got a better argument. I think you have to say that. The law establishes that, right? I think that's a better argument, but that's not the case we have here. We have a one-day-old business here with no assets. I'm trying to understand a concept, and I'm happy to take any business that's been open for two years and has profits and so forth. If the business is worth $25 million, and that means a fair evaluation of what the business is worth, and you destroy the business reputation, isn't $25 million the cap on a reputational damage? I would agree with Your Honor in that regard. But look at it. Suppose we're talking about IBM. Yes, ma'am. And today it's worth, I don't know, $250 billion. But the stock goes up and down. That's a fair evaluation of today. Yes, ma'am. But they've got a new, super-duper computer that they're going to do away with the Microsofts and everybody in the world, and that's in the possibility of going to come out in six months. And they think that that's going to triple their sales, and so the fair market value today is $250 billion. They would, if the business was totally destroyed, they might well be entitled to more than the $250 billion, right? I think, Your Honor, yes, ma'am. That's not quite my question, though. Stock value is market capitalization. I'm not talking about that capitalization. Sometimes that's greater than the value of business or not. The market does make assessments, but there are ways to value businesses when you buy and sell them. Different ways. Different ways. And when somebody goes and takes over another corporation, you usually see a premium for just the hypothetical that Judge Motz said, ongoing ventures, possibilities, and people make those bets. That's the valuation of a company, isn't it? Yes, sir. And as Your Honor pointed out, there are different ways to do that. When you value businesses, you can look at the book value. But my point is, however you value, and I would suggest that market capitalization is not necessarily the value because I don't think you could buy Apple Corporation for the price of its shares today. There's something going on, but somebody would value that business bigger than the market capitalization. But if you were able to achieve, by whatever method, the right valuation of a company that takes into account its perspective of profits, its new ventures, its losses, and so forth, it seems to me that a corporation could never receive reputational damage that's greater than the value of the corporation. I would agree with that, Your Honor. Because it's a commercial entity, whereas a human being has a reputation that has different consequences and much broader and more sophisticated. Do we have some evidence in the record from you about this figure? About the $208 million figure? No, about the hypothetical value of this recently founded corporation that is limited in the way that Judge Niemeyer is talking about. No, ma'am, we have no evidence in the record in that regard. Okay. Thank you. Thank you, Your Honor. All right, we'll come down and greet counsel and take a short recess.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Barbara Milano Keenan